IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JOHN DOE-1, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| LEXISNEXIS RISK SOLUTIONS, INC., et al. | : | NO. 24-4566 |

MEMORANDUM

Bartle, J. August 26, 2026

Plaintiffs Jane Doe-2, John Doe-3, and John Doe-4[1] bring this putative class action on behalf of themselves and others similarly situated against defendants LexisNexis Risk Solutions, Inc. ("LexisNexis") and Richard Roes 1-10 and ABC Companies 1-10. Their third amended complaint contains one claim that LexisNexis (and the other defendants) violated the Fair Credit Reporting Act (15 U.S.C. § 1681(c)-1(i)(2)(A)). It alleges that LexisNexis placed security freezes on plaintiffs' accounts instead of adhering to their requests simply to remove from and not disclose on its websites and communications their home addresses and unpublished telephone numbers.

Before the court is the motion of plaintiffs for class certification pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure. The plaintiffs seek damages only.

---

1 John Doe-1 withdrew as a named plaintiff but remains a member of the putative class.

I

Plaintiffs are police officers and thus "covered persons" under a New Jersey statute known as Daniel's Law. With certain exceptions not relevant here, Daniel's Law prohibits any person, business, or association ("entity"), when requested, from disclosing the home addresses and personal telephone numbers of active and retired judges, prosecutors, police officers, and other public officials as well as those of their immediate family members. N.J. Stat. Ann. § 56:8-166.1(a)(1) (West); 2021 N.J. Laws 371 (West); 2020 N.J. Laws 125 (West).[2] The requested entity has ten days to comply.

LexisNexis is a consumer reporting agency governed by the Fair Credit Reporting Act. It makes available to its customers credit-related information about consumers. Consumer reporting agencies, like LexisNexis, gather consumer data and assemble it into credit reports, which then aid third parties in evaluating the creditworthiness of a particular consumer. 15 U.S.C. § 1681a(f); TransUnion LLC v. Ramirez, 594 U.S. 413, 419 (2021). That information is used by third parties, for example, to decide whether to provide to the consumer a service such as a mortgage, a loan, or insurance.

---

2. Daniel's Law is codified as amended as follows: N.J. Stat. Ann. §§ 2C:20-31.1, 17:46B-1.1, 19:31-18:1, 46:26A-12, 47:1-17, 47:1A-1.1, 47:1A-5, 47:1B-1, 47:1B-2, 47:1B-3, 47:1B-4, 56:8-166.1, 56:8-166.3.

The putative class consists of the 18,607 covered persons who exercised their right under the Daniel's Law to request that LexisNexis no longer disclose or otherwise make available their home addresses and unpublished home telephone numbers.[3] Starting in December 2023, the covered persons began sending written requests to LexisNexis to stop disclosing their protected information. Their requests were submitted to the same Lexis email account, privacy@lexisnexisrisk.com, and typically were in the following form:

> To Whom It May Concern:
>
> I am a "Covered Person" as defined by New Jersey Law P.L. 2023, c.113, P.L. 2021, c.371 (as amended, the "Act"). Pursuant to the Act and Section 3 of New Jersey P.L. 2015, c.226 (C.56:8-166.1) (as amended), I hereby request that you not disclose or re-disclose on the Internet or otherwise make available, the following protected information:
>
> Name: ______________________________________
>
> Home Address: ______________________________
>
> Sincerely,
> [Covered Person].

As a result, on January 16, 2024, LexisNexis began to impose security freezes as to each covered person who submitted

[3] The actual number in the putative class is not totally clear from the record. Plaintiffs claim it is 18,607, while defendants claim it is in the 17,000s. While the difference does not appear to be material, we will accept plaintiffs' number for present purposes.

a request for whom it had a matching identifier. A security freeze, otherwise known as a credit freeze, is a restriction on access by third parties such as banks and insurance companies to a person's credit report. See What is a credit freeze or security freeze on my credit report?, Consumer Financial Protection Bureau (Sept. 5, 2025), https://www.consumerfinance.gov/ask-cfpb/what-is-a-credit-freeze-or-security-freeze-on-my-credit-report-en-1341/. A security freeze is often used as a mechanism by consumers to prevent identity thieves from opening accounts under their names. Id.

Nothing in any of the Daniel's Law requests sought a security or credit freeze, and the words "credit," "security" or "freeze" do not appear in the requests. LexisNexis admits that "these consumers did not technically request a security freeze." It asserts, however, that it could not redact home addresses and unpublished telephone numbers from consumer reports without such a freeze. Ultimately, it implemented 18,607 security freezes on those who submitted requests pursuant to Daniel's Law.

Thereafter, some 3,000 of those individuals sent requests to LexisNexis to remove the unsolicited security freezes. Those freezes were lifted shortly thereafter. Other covered persons periodically requested a temporary removal on the freeze on their accounts for a specific transaction and then

had the freeze re-imposed. As of April 2026, 14,178 of the putative class members have allowed their accounts to remain frozen.

Plaintiff John Doe-3 alleges he was unable to transfer the title of his wife's car from her name to his because of the security freeze. Plaintiff John Doe-4 asserts he sought to purchase an automobile and insurance but as a result of the security freeze was unable to obtain credit to do so.[4]

Only thirteen proposed class members show evidence that they were denied credit or a service due to the security freezes imposed by LexisNexis. These individuals aver that they were unable to obtain insurance as LexisNexis did not provide consumer reports to the insurance companies. Plaintiffs seek a subclass for these individuals.[5]

II

Class certification requires a finding that each of the relevant requirements of Rule 23 has been met. See In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 320 (3d Cir. 2008), as amended (Jan. 16, 2009). The court may "delve beyond the pleadings to determine whether the requirements for class certification are satisfied," including Article III standing.

---

4 Plaintiff Jane Doe-2 has admitted that she never sought credit or insurance during the two month period she was the subject of a security freeze.

5 Plaintiffs argue there are more in this category but have not established a larger number.

Id. at 316 (internal quotation marks omitted). This may include an inquiry into the merits of each claim in order to resolve relevant factual disputes. Id. Factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence. Id. at 320. To certify a class the district court must find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23. Id.

III

LexisNexis argues that plaintiffs' motion for class certification fails because virtually all of the putative class members lack standing.

Article III of the Constitution limits the jurisdiction of the federal courts to actual "cases or controversies." U.S. Const. art. III, § 2. To establish standing, "a plaintiff must demonstrate: (i) that she has suffered or is likely to suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." FDA v. All. for Hippocratic Med., 602 U.S. 367, 380 (2024). An injury must be concrete, that is it must be real and not abstract. Id. at 381.

The Supreme Court's decision in TransUnion LLC v. Ramirez, 594 U.S. 413 (2021), analyzed the question of standing

under the Fair Credit Reporting Act. That action involved a certified class action of 8,185 consumers with alerts in their credit files maintained by TransUnion, a credit reporting agency. Id. at 419-20. The alerts labeled these consumers as "potential match[es]" to those on a list maintained by the United States Treasury Department's Office of Foreign Assets Control (OFAC) of terrorists, drug traffickers, and other serious criminals. The names of the consumers were similar to those on the OFAC list. Id. The named plaintiff claimed that TransUnion violated the Fair Credit Reporting Act by failing to use reasonable procedures to ensure the accuracy of the credit files of the class members. Id. at 421.

Of the 8,185 class members, TransUnion had provided credit reports on 1,853 of them to third-party businesses. Id. These reports in effect identified these class members as potential terrorists, drug traffickers, and serious criminals. The Court held that those 1,853 individuals suffered a concrete injury in fact. It ruled, however, that the remaining class members did not have standing as TransUnion had not disseminated the alerts as to them to third parties. Id. at 433. These alerts remained concealed in the internal files of TransUnion. Id. Consequently, these plaintiffs had not suffered any injury. Id. at 434.

The Supreme Court's decision in TransUnion, as noted, involved standing of the members of a certified class. Every class member must have standing to recover individual damages. Id. at 431. In a footnote, the court stated it was not deciding whether every class member must demonstrate standing before a court certifies a class. Id. at 431 n.4.

Our Court of Appeals has explained that at least one named plaintiff in a class action must have standing for the court to have subject matter jurisdiction. Neale v. Volvo Cars of N. Am., LLC, 794 F.3d 353, 362 (3d Cir. 2015). Plaintiffs John Doe-2 and John Doe-3 have asserted a concrete injury and thus have standing. At the class certification stage, it is not necessary that every putative class member have standing for the action to be justiciable. Id. Nonetheless, the standing of putative class members may inform whether a proposed class satisfies the requirements of Rule 23. Huber v. Simon's Agency, Inc., 84 F.4th 132, 155 (3d Cir. 2023). The potential inclusion of some members without standing in a class can result in "legitimate Rule 23 challenges." Huber, 84 F.4th at 155 (citing Neale, 794 F.3d at 367-68). A class seeking to be certified under Rule 23(b)(3), like this one, requires the plaintiffs to show that individualized questions regarding the standing of unnamed class members will not overwhelm common questions, such

that they cannot meet the predominance requirement of Rule 23(b)(3). Huber, 84 F.4th at 156.

Consumers often request security freezes to protect their privacy and to prevent identity theft. They view it as a benefit to be able to block their information. Security freezes cause no reputational harm and have no impact on consumers if they are not seeking credit or a service requiring a credit report. If the consumers need to seek credit, insurance or another service from a third party, they may have the freeze lifted. Significantly, federal regulations provide that a lender cannot deny credit to a credit-worthy applicant due to a consumer's security freeze. See 12 C.F.R. § 1002.7(a); 12 C.F.R. § 1002.2(z); 15 U.S.C. 1681c-1. A potential creditor could also obtain needed information from another credit reporting agency if no security freeze has been imposed by one consumer reporting agency.[6] The third-party creditor, of course, may grant the service despite the freeze.

For a security freeze to cause injury, a person must have sought credit or other benefit from a creditor or other third party while a security freeze was in place, the creditor

[6] For example, formerly named plaintiff John Doe-1 sought a credit card from Capital One during the time of his security freeze at LexisNexis. Capital One obtained his credit information from Experian and approved his application. John Doe-1, while no longer a named plaintiff, is a member of the proposed class.

or other third party could not obtain the person's credit information because of the freeze, and the credit or other service was refused as a result.

It is not necessary, as noted, for each putative class member at the certification stage to show that he or she has standing for the court to have subject matter jurisdiction. Huber, 84 F.4th at 155. Nonetheless, the number of putative class members who have standing may affect whether the requirements for class certification under Rule 23 have been satisfied. If, for example, the vast majority suffered a concrete injury and thus have standing, common questions of fact may predominate. If, in contrast, only a few have been injured, common questions of fact will not predominate.

Except for thirteen individuals who were denied insurance, there is nothing in the record to show that the remaining putative class members were denied credit or any service as a result of the freezes. Some 3,000 of the 18,607 covered persons reached out and had the freezes lifted shortly after its implementation. Other covered persons periodically requested a temporary lift on the freeze for a specific transaction and then had the freeze reimposed. There are 14,178 members of the putative class who have allowed their security freezes to remain in place. The evidence demonstrates that the overwhelming percentage of putative class members have incurred

no injury and thus lack standing. Class certification fails because common issues of fact do not predominate under Rule 23(b)(3). See Huber, 84 F.4th at 155-57.

IV

Even if all putative class members could show an injury, the type and extent of the injury would have to be determined separately for each class member. Each class member would have to prove he or she sought credit or other benefit from a creditor or other third party while a security freeze was in place, the creditor or other third party could not obtain the personal credit information because of the freeze, and the credit or other service was refused as a result. Any determination of injury would require evidence not only from each of the over 18,000 class members but also from countless third-party creditors, insurers and others. Such a class would clearly not have commonality as required under Rule 23. The court would face unworkable difficulties in managing such a class. See Fed. R. Civ. P. 23(b)(3)(D); Huber, 84 F.4th at 155-57. A class action here would not be superior to other available methods for fairly and efficiently adjudicating the controversy. See Fed. R. Civ. P. 23(b)(3).

At best, plaintiffs have come forward with evidence that the thirteen proposed class members who sought and were denied insurance coverage have an Article III injury, thirteen

class members, however, do not meet the numerosity requirement of Rule 23(a)(1). Numerosity is established where "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); In re Modafinil, 837 F.3d 238, 249-50 (3d Cir. 2016); Kerrigan v. Phila. Bd. of Election, 248 F.R.D. 470, 473-74 (E.D. Pa. 2008). "'Impracticable does not mean impossible,' and refers rather to the difficulties of achieving joinder." In re Modafinil, 837 F.3d at 249 (quoting Robidouz v. Celani, 987 F.2d 931, 935 (2d Cir. 1993)). Although there is no threshold number needed to satisfy numerosity requirement for class action certification, a proposed class of more than 40 members will generally suffice. See Stewart v. Abraham, 275 F.3d 220, 227 (3d Cir. 2001); In re Processed Egg Prods. Antitrust Litig., 312 F.R.D. 124 (E.D. Pa. 2015). These thirteen individuals alleging a concrete injury do not meet the numerosity requirement for class certification.

V

For the reasons stated above, the motion of plaintiff for certification of the class will be denied.

BY THE COURT:

/s/ Harvey Bartle III
J.