**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

JOHN DOE-3 and JOHN DOE-4, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

LEXISNEXIS RISK SOLUTIONS INC., RICHARD ROES 1-10, fictitious names of unknown individuals, and ABC COMPANIES 1-10, fictitious names of unknown entities,

Defendants.

Civil Action No. 1:24-cv-04566
Honorable Harvey Bartle, III, U.S.D.J.

# DEFENDANT LEXISNEXIS RISK SOLUTIONS INC.'S BRIEF IN OPPOSITION TO MOTION FOR CLASS CERTIFICATION

A. Matthew Boxer, Esq.
Gavin J. Rooney, Esq.
Rasmeet K. Chahil, Esq.
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
973.597.2500
mboxer@lowenstein.com
grooney@lowenstein.com
rchahil@lowenstein.com

*Attorneys for Defendant LexisNexis Risk Solutions Inc.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........ ii

I. PRELIMINARY STATEMENT ........ 1

II. STATEMENT OF FACTS ........ 2

A. LNRS and Its Products ........ 2

B. Security Freezes ........ 2

C. The Daniel's Law Requests at Issue ........ 4

D. Potential Impact on Class Members ........ 8

III. LEGAL STANDARD ........ 10

IV. LEGAL ARGUMENT ........ 12

A. Class Certification Under Rule 23(b)(3) Should Be Denied ........ 12

1. Individual Issues Predominate, Rendering Class Certification Inappropriate ........ 12

i. Whether a Freeze Was Requested Is an Individualized Question ........ 12

ii. Injury Is an Individualized Question ........ 14

2. The Class Is Not Ascertainable ........ 18

3. A Class Action Is Not a Superior Means of Adjudication ........ 22

B. Certification of the Subclass Should Be Denied ........ 23

1. The Subclass Lacks Numerosity ........ 23

2. The Subclass Is Not Ascertainable ........ 25

V. CONCLUSION ........ 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Agostino v. Quest Diagnostics Inc.*,
256 F.R.D. 437 (D.N.J. 2009) ....................23

*Allen v. Ollie's Bargain Outlet, Inc.*,
37 F.4th 890 (3d Cir. 2022) ....................23, 24

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ....................10

*Bennett v. Quest Diagnostics, Inc.*,
No. 17-1590, 2023 U.S. Dist. LEXIS 99792 (D.N.J. June 8, 2023) ....................19

*Brooks v. Trans Union LLC*,
743 F. Supp. 3d 622 (E.D. Pa. 2024) ....................16

*Bultemeyer v. CenturyLink Inc.*,
No. 2:14-cv-02530 (D. Ariz. Aug. 13, 2025), Dkt. 307 ....................17

*Bultemeyer v. CenturyLink Inc.*,
No. 24-6413 (9th Cir. Mar. 3, 2026), Dkt. 50 ....................17

*Byrd v. Aaron's Inc.*,
784 F.3d 154 (3d Cir. 2015) ....................20

*Carrera v. Bayer Corp.*,
727 F.3d 300 (3d Cir. 2013) ....................11, 18, 20

*In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.*,
795 F.3d 380 (3d Cir. 2015) ....................12

*Dukich v. IKEA U.S. Retail LLC*,
343 F.R.D. 296 (E.D. Pa. 2022) (Bartle, J.) ....................13, 23

*Gen. Tel. Co. of the Nw., Inc. v. EEOC*,
446 U.S. 318 (1980) ....................24

*Guidry v. Wilmington Tr.*,
333 F.R.D. 324 (D. Del. 2019) ....................21

*Harnish v. Widener Univ. Sch. of L.*,
833 F.3d 298 (3d Cir. 2016) ....................13

*Harper v. Trans Union, LLC*,
No. 04-3510, 2006 U.S. Dist. LEXIS 91813 (E.D. Pa. Dec. 20, 2006)....16, 23

*Huber v. Simon's Agency, Inc.*,
84 F.4th 132 (3d Cir. 2023)....11, 15, 16, 18

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2009)....10

*J.V. v. LexisNexis Risk Sols. Inc.*,
No. 2:25-cv-18288 (D.N.J. Dec. 8, 2025), Dkt. 1-1....22

*Kaplan v. Trans Union, LLC*,
No. 24-cv-2438, 2026 U.S. Dist. LEXIS 95545 (E.D. Pa. Apr. 29, 2026)....16

*Kelly v. RealPage Inc.*,
47 F.4th 202 (3d Cir. 2022)....13

*Klotz v. Trans Union, LLC*,
246 F.R.D. 208 (E.D. Pa. 2007)....22

*Lloyd v. Covanta Plymouth Renewable Energy, LLC*,
585 F. Supp. 3d 646 (E.D. Pa. 2022) (Bartle, J.)....16, 23

*Marcus v. BMW of N. Am., LLC*,
687 F.3d 583 (3d Cir. 2012).... *passim*

*Marino v. Ocwen Loan Servicing LLC*,
978 F.3d 669 (9th Cir. 2020)....18

*McIntyre v. RealPage, Inc.*,
336 F.R.D. 422 (E.D. Pa. 2020)....17

*Mielo v. Steak 'n Shake Operations, Inc.*,
897 F.3d 467 (3d Cir. 2018)....24

*In re Modafinil Antitrust Litig.*,
837 F.3d 238 (3d Cir. 2016)....24

*Mwantembe v. TD Bank, N.A.*,
268 F.R.D. 548 (E.D. Pa. 2010)....9

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
259 F.3d 154 (3d Cir. 2001)....11

*In re Niaspan Antitrust Litig.*,
67 F.4th 118 (3d Cir. 2023)....20

*Paper Sys. Inc. v. Mitsubishi Corp.*,
177 F.R.D. 435 (E.D. Wis. 1997) ....................21

*Pendleton v. Trans Union Sys. Corp.*,
76 F.R.D. 192 (E.D. Pa. 1977) ....................22

*In re Prudential Ins. Co. of Am. Sales Pracs. Litig.*,
962 F. Supp. 450 (D.N.J. 1997) ....................25

*Ramirez v. Trans Union, LLC*,
No. 12-cv-00632, 2017 U.S. Dist. LEXIS 184560 (N.D. Cal. Nov. 7, 2017) ....................16

*Ramirez v. TransUnion LLC*,
No. 3:12-cv-00632 (N.D. Cal. Dec. 15, 2022), Dkt. 428 ....................17

*In re Ry. Indus. Emp. No-Poach Antitrust Litig.*,
395 F. Supp. 3d 464 (W.D. Pa. 2019) ....................21

*Safeco Ins. Co. of Am. v. Burr*,
551 U.S. 47 (2007) ....................18

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ....................11, 16

*Stillmock v. Weis Mkts., Inc.*,
385 F. App'x 267 (4th Cir. 2010) ....................17

*Stromberg v. Midland Funding, LLC*,
No. 16-9288, 2024 U.S. Dist. LEXIS 70792 (D.N.J. Apr. 18, 2024) ....................15, 18

*Sullivan v. DB Invs., Inc.*,
667 F.3d 273 (3d Cir. 2011) ....................21

*Summerfield v. Equifax Info. Servs. LLC*,
264 F.R.D. 133 (D.N.J. 2009) ....................17

*Taylor v. J.B. Hunt Transp. Servs., Inc.*,
No. 22-4832, 2025 U.S. Dist. LEXIS 121391 (D.N.J. June 26, 2025) ....................16

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .................... *passim*

**STATUTES**

15 U.S.C. § 1681c-1 .................... *passim*

15 U.S.C. § 1681n ....................18, 23

15 U.S.C. § 1681o ....................23

Cal. Civ. Code § 1798.145(d)(1)–(2) .....5

Colo. Rev. Stat. § 6-1-1304(2)(i) .....5

N.J.S.A. 56:8-166.1 .....4, 5

N.J.S.A. 56:8-166.13(f) .....5

Va. Code Ann. § 59.1-576(C)(10) .....5

**RULES**

Fed. R. Civ. P. 23 ..... *passim*

**REGULATIONS**

12 C.F.R. § 1002.2 .....3

12 C.F.R. § 1002.7 .....3

**OTHER AUTHORITIES**

*Direct*, Merriam-Webster, https://www.merriam-webster.com/dictionary/direct .....13

Defendant LexisNexis Risk Solutions Inc. ("LNRS") respectfully submits this brief in opposition to the motion for class certification ("Motion") filed by Plaintiffs John-Doe-3 ("Doe-3") and John-Doe-4 ("Doe-4") (collectively, "Plaintiffs").

## I. PRELIMINARY STATEMENT

Plaintiffs' arguments in favor of class certification fall flat at every turn. The record makes clear that class certification would result in logistical and substantive chaos. Individualized questions overwhelm any common ones. For example, whether each putative class member wanted a security freeze, whether any creditor inquiry was ever made to LNRS while a freeze was in place, and whether the freeze caused any cognizable injury all require person-by-person inquiry.

Many putative class members suffered no injury at all—some never sought credit or insurance, some were unaware of the freeze, some lifted it to complete transactions they wanted, and others simply obtained what they needed from another source. Because a court may not award relief to uninjured class members, and because identifying the few who may have been injured would require a file-by-file review and inquiries to countless third-party creditors and insurers, Plaintiffs cannot establish predominance, ascertainability, or superiority. Their proposed subclass suffers from the same deficiencies and also lacks numerosity.

The Motion ultimately rests on a distorted version of the record containing factual misstatements and relying heavily on unfounded merits assertions that are irrelevant to class certification. Plaintiffs misstate the size of the putative class, they misstate the experiences of the named Plaintiffs, they define the class to include requests sent to a different entity (SageStream LLC) that is not even a defendant, and they attempt to manufacture class-wide injury out of inadmissible hearsay and double hearsay, rather than competent, common proof. Plaintiffs have not satisfied their burden to prove the requirements of Rule 23 of the Federal Rules of Civil Procedure and the Motion should be denied.

## II. STATEMENT OF FACTS

### A. LNRS and Its Products.

LNRS is a consumer reporting agency ("CRA") that provides to its customers products governed by the Fair Credit Reporting Act ("FCRA"). (*See* Declaration of Richard Gardner ("Gardner Decl.") ¶ 3.) For example, LNRS products provide consumers' claims histories and driving histories to insurance companies, and information on consumer creditworthiness to financial institutions. (*Id.* ¶¶ 4–5.) LNRS does not itself issue credit to or provide other services to consumers and is not in privity with the proposed class members in this case. (*See id.* ¶ 6.)

Many companies other than LNRS also operate in the consumer reporting industry. For example, the three major credit bureaus—TransUnion, Equifax, and Experian—provide credit reports and scores to lenders, creditors, and others. (Declaration of Troy Kubes ("Kubes Decl.") ¶ 19.) Other CRAs create consumer reports for certain industries or purposes, such as insurance or employment screening. (*Id.* ¶¶ 19, 23.)

### B. Security Freezes.

LNRS offers consumers the ability to place a security freeze on their LNRS consumer reports, as required by the FCRA and various state laws. (Gardner Decl. ¶ 10.) A security freeze is a method of protecting consumer privacy. (*See id.* ¶ 11.) It limits third-party access to a consumer report and prevents the CRA from disclosing the report, absent the consumer's consent. (*Id.*; Kubes Decl. ¶ 29.) Courts, consumers, and commentators alike uniformly have observed that such freezes are a pro-consumer, privacy-protective act, as a tool to fight identity theft. (Gardner Decl. ¶ 11; Kubes Decl. ¶ 31.) Many consumer advocacy groups urge all consumers to implement security freezes, as a matter of course, to protect themselves; estimates indicate that nearly one in five Americans has done so. (Kubes Decl. ¶ 31.)

Consumers can request that LNRS implement a security freeze by phone, web portal, U.S. mail, or email. (Gardner Decl. ¶ 12; Kubes Decl. ¶ 34.) There is no "magic language" needed to request a security freeze, and LNRS honors such a request however it is communicated, as LNRS strives to be as protective of consumers as is reasonably warranted. (Gardner Decl. ¶ 13.)

When LNRS implements a security freeze, that does not impact the provision of information by any other CRA. (*Id.* ¶ 12; Kubes Decl. ¶ 57.) If the consumer wishes to freeze consumer reports generated by other CRAs, the consumer must contact each CRA separately. (Kubes Decl. ¶ 57.) Creditors thus continue to have access to credit-reporting data following a security freeze by one CRA. (*Id.*)

There is nothing inherently injurious about a security freeze. (*Id.* ¶ 53.) Federal regulations provide that a lender cannot deny credit due to a consumer's security freeze. *See* 12 C.F.R. § 1002.7(a); *id.* § 1002.2(z). Consumers subject to security freezes can, and commonly do, secure credit by temporarily lifting the freeze for purposes of a specific transaction. (Gardner Decl. ¶ 35; Kubes Decl. ¶ 36.) When a security freeze is put in place, the consumer receives a letter that confirms the imposition of the freeze and informs the consumer of "the process by which the consumer may remove the security freeze, including a mechanism to authenticate the consumer." 15 U.S.C. § 1681c-1(i)(2)(B)(ii)(I). Following authentication, the freeze may be lifted by the consumer at any time, either permanently or temporarily to facilitate a particular transaction. *Id.* § 1681c-1(i)(3)(A)(i).

LNRS affiliates have a similar opt-out process for non-FCRA information. Whether a freeze, an opt-out, or both are requested is dependent on the specific verbiage and context of the request, as explained below. (Gardner Decl. ¶ 30; Kubes Decl. ¶ 51.)

### C. The Daniel's Law Requests at Issue.

New Jersey Daniel's Law enables "covered persons" to instruct any business to "not disclose or re-disclose on the Internet or otherwise make available, the home address or unpublished home telephone number of [the] covered person." N.J.S.A. 56:8-166.1(a)(1). Per the statute, if a disclosure is made after ten business days following such a request, liability attaches and statutory and other damages may result. *See* N.J.S.A. 56:8-166.1.

Following the 2023 amendment of New Jersey Daniel's Law to allow for statutory damages and the assignment of claims, Atlas Data Privacy Corporation ("Atlas") approached thousands of New Jersey law enforcement officers with an offer to facilitate transmission of Daniel's Law "takedown notices" to be sent via "AtlasMail." (*See* Ex. A ¶¶ 26, 31–34.)[1] Atlas provided an extensive list of "data brokers" to send non-disclosure requests to, with an option to "select all," without explaining that certain companies were CRAs or advising what may result from sending a nondisclosure request to a CRA. (Ex. B, Doe-3 Dep. Tr. 58:11–22, 61:7–10.) Then, over the Christmas and New Year's holidays in late 2023/early 2024, Atlas bombarded LNRS with 47,000 nondisclosure emails. (Gardner Decl. ¶ 15.) Rather than provide the information in an organized format, Atlas sent a disorganized mass of duplicative and triplicate (or more) requests to privacy@lexisnexisrisk.com, vastly complicating the process of complying with the requests within the ten-day statutory period. (*Id.* ¶ 16.) Atlas did not contact LNRS before sending the tens of thousands of emails to provide any explanation. Atlas then sent a similar, but not identical, set of emails to the same inbox, now addressed to SageStream LLC ("SageStream"), so that the total number of emails sent was over 94,000. (*Id.* ¶ 20.) SageStream is an LNRS subsidiary that is a

---

[1] All of LNRS's lettered exhibits are attached to the accompanying declaration of A. Matthew Boxer, Esq. ("Boxer Decl.").

CRA and offers only consumer-reporting services governed by the FCRA and similar state statutes. (*Id.* ¶ 18.)

The broadly worded takedown notices requested that LNRS not "disclose or re-disclose on the internet or otherwise make available, the following protected information" and then listed names, addresses, and phone numbers. (Exs. C, D.) LNRS consumer reports contain such identifying information. Indeed, such information enables the receiving party to confirm the subject of the report. (Gardner Decl. ¶ 21; Kubes Decl. ¶ 44.)

The federal Daniel's Law statute and other state privacy laws generally exclude from their reach credit reports and other matters regulated by the FCRA. *See, e.g.*, Cal. Civ. Code § 1798.145(d)(1)–(2) (FCRA carve-out for California Consumer Privacy Act); Colo. Rev. Stat. § 6-1-1304(2)(i) (FCRA carve-out for Colorado Privacy Act); Va. Code Ann. § 59.1-576(C)(10) (FCRA carve-out for Virginia Consumer Data Protection Act). New Jersey privacy statutes commonly include FCRA carve-outs as well. *See, e.g.*, N.J.S.A. 56:8-166.13(f) (FCRA carve-out for New Jersey Data Privacy Act). Conspicuously, the New Jersey Daniel's Law statute does not; therefore, it would apply to FCRA-related data.

It would be impossible for LNRS to satisfy these requests without security freezes. Such freezes are the statutory mechanism to secure consumers' FCRA information against disclosure. *See* 15 U.S.C. § 1681c-1(i)(2); (Gardner Decl. ¶ 22). [redacted]

[redacted] Thus, LNRS employed the prescribed statutory security freeze process.

In an earlier colloquy, the Court referred to the position in which LNRS found itself following this barrage of takedown requests and a limited period in which to act or face damages:

> [I]sn't it reasonable for LexisNexis to say, all right, Jane Doe doesn't want her name and address disclosed? So that if a creditor comes to LexisNexis and asks for information on Jane Doe, . . . LexisNexis can't provide that, can't provide the home address and, therefore, can't provide any information. . . . [W]hat is LexisNexis supposed to do if the creditor comes in and asks for information about Jane Doe? Is the agency going to say, okay, here's all the information about Jane Doe, but guess what, . . . we won't give you her name, but this has to be her credit information? . . . ***[H]ow can they possibly remove the name and home address without imposing a credit freeze?***

(Dkt. 62 at 57:7–13, 57:16–20, 59:7–9 (emphasis added).) Atlas itself has recognized no FCRA exception to New Jersey Daniel's Law in filing lawsuits against TransUnion and Equifax, two of the credit bureaus, for violations of Daniel's Law essentially because they did not issue security freezes. *Atlas Data Priv. Corp. v. TransUnion, LLC*, BER-L-000810-24 (Law Div.); *Atlas Data Priv. Corp. v. Equifax Inc.*, BER-L-000919-24 (Law Div.).[2]

Contrary to Plaintiffs' suggestion (*e.g.*, Pls. Br. at 14), LNRS did not and does not retaliate against consumers (law enforcement officers or otherwise) for making a Daniel's Law request. (Gardner Decl. ¶ 29.) It would be against LNRS's interests to engage in any so-called retaliation, as law enforcement agencies form a large part of the company's customer base.[3] Processing

---

[2] Plaintiffs cannot have it both ways. On one hand, they point to the credit bureaus' failure to implement security freezes as evidence that LNRS's freezes were improper, but on the other, Atlas sued TransUnion and Equifax for violations of Daniel's Law resulting from the lack of security freezes. In any event, what the three credit bureaus did or did not do is irrelevant here, as each CRA has different processes. (Kubes Decl. ¶ 47.) For example, Equifax and TransUnion took the position that the Atlas emails were sent to the wrong inbox, and were therefore a nullity; their decision not to implement security freezes is probative of nothing. (Pls. Exs. 16, 17.)

[3] For example, an LNRS affiliate provides the Accurint product, which helps law enforcement agencies investigate criminal activity by connecting them to public records information. (*Id.* ¶ 8.) The LexisNexis companies have a

nondisclosure requests is a normal, regular part of business, even though the requests at issue here presented unique challenges. (*Id.* ¶ 29.)

An opt-out (for non-FCRA reports) and a security freeze (for FCRA consumer reports) together result in the consumer's entire file being unavailable. [redacted] (*Id.* ¶¶ 25, 28.) This aligns with the practices of other companies across the industry. (Kubes Decl. ¶ 49.)

A security freeze can easily be lifted. (*Id.* ¶ 54; Gardner Decl. ¶ 12.) LNRS mailed every Atlas security freeze recipient a letter with instructions on how to lift the freeze by calling or emailing the LNRS Consumer Center and providing the personal identification number ("PIN") assigned. (Gardner Decl. ¶ 31; *see* Ex. E.) Consumers can also lift a freeze through LNRS's web portal. (Gardner Decl. ¶ 32.)

In addition, Atlas sent a mass email to the covered persons, providing them with a template email they could send to LNRS to lift the freeze. (*See* Ex. F.) Notably, the vast majority of these covered persons declined to lift their security freezes. Only 3,000 of the 17,000 covered persons (about 18%) who used AtlasMail accounts to send Daniel's Law requests to LNRS/SageStream in December 2023 and January 2024 and had security freezes implemented thereafter emailed, called, or used the web portal to lift the freeze. (Gardner Decl. ¶ 36.)[4] The remaining 14,000 individuals did not lift the freeze, confirming they wanted the freeze in place. (Kubes Decl. ¶ 60.) Other covered persons periodically requested a temporary lift of the freeze, rather than a permanent lift—meaning that it would be lifted for a specific transaction, then put back on. (*See, e.g.,* Ex. G.)

long history of working with law enforcement, including the Federal Bureau of Investigation and the Department of Homeland Security, as well as thousands of state and local law enforcement agencies. (*Id.* ¶ 9.)

4 Plaintiffs incorrectly assert that LNRS implemented over 18,600 freezes. (Pls. Br. at 7.)

This, too, shows that those covered persons wanted the freeze as a general matter. (*See* Kubes Decl. ¶ 60.)

### D. Potential Impact on Class Members.

Security freezes often have no impact whatsoever on consumers. (*Id.* ¶ 53.) For a security freeze to have an impact: (1) the consumer must have sought credit or other benefit from a creditor or other third party; (2) that creditor, in turn, must have sought to use an LNRS product during its diligence (as opposed to products offered by Equifax, Experian, TransUnion, or the myriad other CRAs); (3) the consumer must have not lifted the freeze to permit the transaction; (4) no security freeze exceptions applied, such that LNRS did not return information due to the freeze; (5) the creditor and the consumer must have been unable to secure similar information from non-LNRS sources; and (6) the credit or other service must have been refused to the consumer. (*Id.* ¶ 55.) It is also possible that even if a consumer did not have a freeze in place, the consumer would have been denied credit anyway; for example, if their credit score was low or if they did not have an established credit history. (*Id.* ¶ 58.)

The experiences of the named Plaintiffs reflect these realities and the varied circumstances among consumers. For example, Plaintiff Doe-2 admitted she never sought credit or insurance during the brief two-month period that she had a security freeze with LNRS. (Ex. H.) She suffered no injury. (*Id.*) There are likely many class members who likewise never sought credit/insurance at all, or sought it from an entity that obtains consumer reports from another source.

As noted above, even if a consumer were for some reason having difficulty lifting a freeze at LNRS, a potential creditor could obtain needed information elsewhere. For example, Plaintiff Doe-1 sought a credit card from Capital One during the time his security freeze was in place at LNRS. (*See* Exs. I–K.) Capital One simply obtained his credit information from Experian and approved his application. (*See* Exs. I–K.) Similarly, Doe-1 obtained a loan from TD Bank, which

used information from Equifax. (Exs. L, M.) After LNRS obtained this information regarding Doe-1 and Doe-2 in discovery, they withdrew from the case as named plaintiffs, but they remain in the proposed class.

The facts involving Plaintiff Doe-3 and Plaintiff Doe-4 are no less particularized and no more indicative of any injury. Doe-4 temporarily lifted his LNRS security freeze four times to engage in specific transactions, each time taking care to put the freeze back in place: (1) to finance the purchase of a mattress; (2) to purchase a vehicle; (3) to become a co-signatory on a bank account; and (4) to secure two insurance policies. (*See* Ex. N, Doe-4 Dep. Tr. 71:15–72:3, 91:20–92:1, 118:4–6, 119:13–120:21; Exs. O–S.) When asked why he chose a temporary (as opposed to permanent) security freeze lift, Doe-4 was blunt:

> I was being very cautious in asking for a temporary freeze every time I asked for one because I thought that asking for a permanent freeze lift would reduce my protections under Daniel's Law.

(Ex. N, Doe-4 Dep. Tr. 69:24–70:3.) It is unclear how Doe-4 even has standing to proceed as a plaintiff in this case.[5]

Similarly, the security freeze did not harm Plaintiff Doe-3. Indeed, Doe-3 claims that the freeze was in place for over a year before he was even aware it had been implemented. (Ex. B, Doe-3 Dep. Tr. 121:10–19.) Tellingly, Doe-3 separately has security freezes in place with TransUnion, Equifax, and Experian, though he somehow now claims he did not want one with LNRS. (*Id*. at 54:15–55:13 ("We requested a security freeze so there was no fraud or identity theft. We're trying to prevent that.")). In any event, Doe-3 was able to obtain the car insurance at

---

[5] For the same reason, Doe-4 is not an adequate class representative. As explained below, the individualized nature of these issues precludes any representative from asserting claims typical of the class. Even Plaintiffs' selected representatives do not satisfy that standard. *See, e.g.*, *Mwantembe v. TD Bank, N.A.*, 268 F.R.D. 548, 558 (E.D. Pa. 2010) (finding typicality requirement not met because factual circumstances of the named plaintiffs did not support the legal theory of the class, which was "eclipsed by the individualistic defenses the banks can raise to each plaintiff's claim.").

issue despite the security freeze simply by providing a copy of his driver's abstract to the insurer. (Exs. U, B, Doe-3 Dep. Tr. 77:13–81:18.) There was no day on which his vehicle was not insured. (Ex. V ¶ 5.)

## III. LEGAL STANDARD

To obtain class certification, a plaintiff must first meet the threshold requirements of Rule 23(a) of the Federal Rules of Civil Procedure:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Plaintiffs here seek certification solely under Rule 23(b)(3), which permits certification only if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "This predominance requirement 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 600 (3d Cir. 2012) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). To establish predominance, "[a] plaintiff must 'demonstrate that the element of the legal claim is capable of proof at trial through evidence that is common to the class rather than individual to its members.'" *Id.* (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2009)). "If proof of the essential elements of the cause of action requires individual treatment, then class

certification is unsuitable." *Hydrogen Peroxide*, 552 F.3d at 311 (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001)).

To obtain class certification, Plaintiffs must show, for example, that they can establish classwide standing and injury without the need for individualized, class member-specific proofs. *See Huber v. Simon's Agency, Inc.*, 84 F.4th 132, 156–57 (3d Cir. 2023). To do so, they must submit evidence enabling the Court to "estimate 'how many class members (or what proportion of them)' have standing." *Id*. at 157 (citation omitted). If few class members have standing, or it will be difficult to identify those that have standing, the class does not meet the predominance requirement of Rule 23(b)(3). *Id.*

Standing is a constitutional requirement under which a plaintiff must show an "injury in fact" that is "concrete and particularized." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338–39 (2016). A statutory violation alone, divorced from concrete harm, is not enough to confer standing. *Id*. at 341. Instead, the alleged injury must be tangible or bear "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). In *TransUnion*, for example, the Court held that a CRA's inclusion of false information in a consumer's internal credit file that is not disseminated to any third parties does not harm the consumer and does not entitle the consumer to civil penalty damages. *Id.* at 434–35.

An additional prerequisite to a Rule 23(b)(3) class action "is that the class must be currently and readily ascertainable based on objective criteria." *Marcus*, 687 F.3d at 592–93. "The method of determining whether someone is in the class must be 'administratively feasible.'" *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013) (quoting *Marcus*, 687 F.3d at 594). Ascertainability

is not satisfied "if individualized fact-finding or mini-trials will be required to prove class membership." *Id.*

Finally, under the superiority requirement of Rule 23(b)(3), courts consider the following:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). "The superiority requirement asks a district court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.*, 795 F.3d 380, 409 (3d Cir. 2015) (citation omitted).

It is Plaintiffs' burden to establish each of these Rule 23 elements by a preponderance of the evidence. *Marcus*, 687 F.3d at 591.

## IV. LEGAL ARGUMENT

### A. Class Certification Under Rule 23(b)(3) Should Be Denied.

#### 1. Individual Issues Predominate, Rendering Class Certification Inappropriate.

##### *i. Whether a Freeze Was Requested Is an Individualized Question.*

In this case, individual issues overwhelm common ones, such that Plaintiffs have not met the predominance test and class certification is inappropriate. Plaintiffs contend that class members did not make a "direct request" for a security freeze, but whether each class member sought a freeze is an individual question. There is no way to determine the intent of each class member without consulting each of them. It is axiomatic that individual issues predominate when trial requires inquiry into the mindset of each class member. *See, e.g.*, *Marcus*, 687 F.3d at 610–

12 (finding that if alleged defects were knowable and class members did not react to that information in sufficiently uniform manner, then individualized issues predominate); *Harnish v. Widener Univ. Sch. of L.*, 833 F.3d 298, 309–10 (3d Cir. 2016) (noting that whether "misrepresentation entered [class members'] decision-making" is "nearly always an individualized question"); *Dukich v. IKEA U.S. Retail LLC*, 343 F.R.D. 296, 308 (E.D. Pa. 2022) (Bartle, J.) (denying class certification on predominance grounds because class members would need to show that lack of notice from retailer was reason they did not participate in recall).[6]

Here, the evidence shows that many members of the proposed class wanted the security freeze to prevent release of their home address and phone number. Such class members have no claim. When it implemented the freezes, LNRS provided each covered person instructions on how to lift the freeze by phone or email. (Ex. E.) Additionally, Atlas provided an email template to request a freeze lift, which the consumers could send with the click of a button. (Ex. F.) Most of the would-be class members did nothing in response. There are approximately 14,000 proposed class members (the vast majority) who chose not to lift the freeze at all, or asked for temporary lifts only; these persons presumably want the security freeze in place to protect their information. (*See* Gardner Decl. ¶ 36.) Additional putative class members initially called LNRS about the security freeze, but decided to keep the security freeze in place. (*Id.* ¶ 34.) Each of these situations is unique.

---

[6] Plaintiffs incorrectly assume that "direct request" under 15 U.S.C. § 1681c-1(i)(2)(A) means an explicit request that uses the words "security freeze." The FCRA does not define "direct" or "direct request," and there is no case law that states a "direct request" is one that explicitly requests a security freeze. Instead, applying the dictionary definition of "direct," a "direct request" is one made by the consumer directly to the CRA without an intervening agency, instrumentality, or influence. *See Direct*, Merriam-Webster, https://www.merriam-webster.com/dictionary/direct (last visited June 26, 2026). Case law supports that interpretation. *See, e.g.*, *Kelly v. RealPage Inc.*, 47 F.4th 202, 219 (3d Cir. 2022) (rejecting "magic words" requirement under another FCRA request provision and explaining that "[n]othing in the statute's text, context, purpose, or history indicates that any magic words are required for a consumer to effect a 'request.'").

For example, Doe-4 specifically asked that his freeze be reinstated after he temporarily lifted it—not once, but four times. He did so to avoid "reduc[ing his] protections under Daniel's Law." (Ex. N, Doe-4 Dep. Tr. 69:24–70:3.) Similarly, Doe-3 testified that he already had security freezes in place with Equifax, Experian, and TransUnion, as he understood a freeze was a privacy-protective measure. (Ex. B, Doe-3 Dep. Tr. 54:17–55:13.) It appears the only reason he did not previously have a freeze with LNRS is because he was unaware that LNRS is a CRA. (*Id.* at 52:16–21.)

Further, most of the covered persons also sent non-disclosure emails to SageStream, a CRA that ***only*** provides FCRA products—those individuals were requesting a security freeze by the very nature of their request, as SageStream does not have non-FCRA products from which it could have opted them out. (Gardner Decl. ¶ 18.) Moreover, why did the more than 600 covered persons who sent opt-out requests addressed to SageStream but not to LNRS do so? The only way to know for certain is to ask them, and pose similar "intent" questions to the thousands of other requestors.

***ii. Injury Is an Individualized Question.***

Whether a freeze injured any class member is also an individual question. A security freeze alone does not constitute an injury—in fact, millions of Americans have security freezes to protect against identity theft. (Kubes Decl. ¶ 59.) It is evident that many of the putative class members suffered no injury. Some may not even be aware they have a security freeze in place, as Doe-3 was not for almost a year. (Ex. B, Doe-3 Dep. Tr. 121:10–19.) *See TransUnion*, 594 U.S. at 438 (no risk of future harm where "the plaintiffs did not present any evidence that the 6,332 class members even *knew* that there were OFAC alerts in their internal TransUnion credit files"). Similarly, the approximately 3,000 individuals who quickly lifted their security freeze en masse at Atlas's behest seemingly had no injury. (*See* Gardner Decl. ¶ 36.) Further, if a consumer has not been the subject of a credit or insurance inquiry, there can be no injury. *See TransUnion*, 594 U.S.

at 434 ("The mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm."). Even if there were an inquiry, the security freeze does not automatically mean that information would not be released—there are exceptions that allow consumer reports to be provided for specific purposes. Moreover, consumers who lifted their freeze on a temporary basis to engage in a specific transaction similarly suffered no injury.

There is no common, classwide evidence to show that the security freezes injured all (or even most) putative class members. To establish such injury, first, LNRS consumer files for all 17,000 class members would have to be examined to determine whether an inquiry was made of LNRS while the individual had a security freeze in place, and whether the freeze prevented information from being provided. Plaintiffs would then need to show that the class member had a loss of some kind. *See id.* at 431 ("Article III does not give federal courts the power to order relief to an uninjured plaintiff, class action or not." (citation omitted)). As the Court previously recognized during a conference in this case, there are many possibilities why a class member may not have been injured even if the freeze prevented a consumer report from being provided by LNRS—a lender could have approved a mortgage despite the freeze, the consumer could have decided they did not want the mortgage, or the consumer could have obtained the mortgage from another lender. (May 21, 2025 Conference; *see also* Kubes Decl. ¶ 58.) Lenders and insurance companies often have alternative sources of credit reporting information, or the consumer may have followed the simple instructions to temporarily lift the freeze to allow the transaction to proceed. (*See* Kubes Decl. ¶¶ 36, 57.)

Injury is a necessary element of a claim for civil penalty damages, and without it, putative class members do not have standing. *See Huber*, 84 F.4th at 156–57; *Stromberg v. Midland Funding, LLC*, No. 16-9288, 2024 U.S. Dist. LEXIS 70792, at *7 (D.N.J. Apr. 18, 2024) (denying

class certification in part because plaintiff failed to demonstrate putative class members suffered harm beyond asserted Fair Debt Collection Practices Act violations). Uninjured individuals can, at most, complain of technical violations that *Spokeo* and *TransUnion* teach are not enough to assert a claim for either compensatory or civil penalty damages. *See Spokeo*, 578 U.S. at 342; *TransUnion*, 594 U.S. at 426–27. Here, injury would have to be determined on a class member-by-class member basis, making class certification unworkable. *See Huber*, 84 F.4th at 155–57; *Lloyd v. Covanta Plymouth Renewable Energy, LLC*, 585 F. Supp. 3d 646, 657 (E.D. Pa. 2022) (Bartle, J.) (denying class certification because predominance was not satisfied as plaintiffs' suit "involves multiple instances of exposure and injuries that will vary significantly from property to property" and "cannot be established on a [classwide] basis"); *Harper v. Trans Union, LLC*, No. 04-3510, 2006 U.S. Dist. LEXIS 91813, at *23–26 (E.D. Pa. Dec. 20, 2006) (denying class certification where individualized inquiries were necessary regarding class members' injuries resulting from inaccuracies in credit reports). Plaintiffs have not provided the evidence needed to establish how many, if any, of the unnamed class members have standing. As a result, class certification is unwarranted. *See Huber*, 84 F.4th at 155–57.

This case is unlike those Plaintiffs cite, (*see* Pls. Br. at 13–14, 21, 25), each of which involved acts that were *ipso facto* injurious and inherently wrongful: falsely reporting that a consumer is on a terrorist watch list, *Ramirez v. Trans Union, LLC*, No. 12-cv-00632, 2017 U.S. Dist. LEXIS 184560, at *1–2 (N.D. Cal. Nov. 7, 2017); falsely reporting that consumers had filed for bankruptcy, *Brooks v. Trans Union LLC*, 743 F. Supp. 3d 622, 630 (E.D. Pa. 2024); taking an adverse employment action, *Taylor v. J.B. Hunt Transp. Servs., Inc.*, No. 22-4832, 2025 U.S. Dist. LEXIS 121391, at *2 (D.N.J. June 26, 2025); failing to block fraudulent information in a credit report, *Kaplan v. Trans Union, LLC*, No. 24-cv-2438, 2026 U.S. Dist. LEXIS 95545, at *1–2 (E.D.

Pa. Apr. 29, 2026); improperly disclosing consumers' credit card numbers, *Stillmock v. Weis Mkts., Inc.*, 385 F. App'x 267, 268 (4th Cir. 2010); falsely reporting eviction records, *McIntyre v. RealPage, Inc.*, 336 F.R.D. 422, 426 (E.D. Pa. 2020); and falsely reporting public records information, *Summerfield v. Equifax Info. Servs. LLC*, 264 F.R.D. 133, 136 (D.N.J. 2009). The conduct Plaintiffs challenge here is different in kind. A security freeze is not inherently wrongful; it is a consumer-protective measure that the FCRA itself encourages, and any consumer who no longer wishes to maintain it may remove it at will. *See* 15 U.S.C. § 1681c-1(i)(2)–(3). Whether any class member was injured by a security freeze is an individualized inquiry that cannot be resolved on a classwide basis.

Those same individual questions refute Plaintiffs' contention that a classwide trial would be "relatively straightforward." (Pls. Br. at 25.) Neither case they cite supports such a notion. In *Ramirez*, the Supreme Court ***reversed*** the classwide verdict, holding that only 1,853 of 8,185 class members whose files were actually disseminated to third parties were injured, and the case then settled. 594 U.S. at 442; Order Granting Motion for Final Approval of Class Action Settlement, *Ramirez v. TransUnion LLC*, No. 3:12-cv-00632 (N.D. Cal. Dec. 15, 2022), Dkt. 428. The parties also had stipulated which class members were injured, *see Ramirez*, 594 U.S. at 421, a circumstance absent here, where the universe of persons harmed is unknown. The other case cited, which remains on appeal, involved a defendant (not a CRA) that *sought* consumer reports and knew which individuals' consumer reports it pulled without a permissible purpose and who were therefore injured. *See Bultemeyer v. CenturyLink Inc.*, No. 24-6413 (9th Cir. Mar. 3, 2026), Dkt. 50; Order at 7, *Bultemeyer v. CenturyLink Inc.*, No. 2:14-cv-02530 (D. Ariz. Aug. 13, 2025), Dkt. 307. Here, by contrast, any determination of injury requires inquiry of class members, third-party creditors, insurers, and others, rendering this case untriable as a class action.

Plaintiffs' argument that statutory damages alone establish predominance fails. First, Plaintiffs cannot show that LNRS willfully violated the FCRA, a prerequisite for such damages.[7] *See* 15 U.S.C. § 1681n. Under FCRA caselaw, willfulness is absent unless an appellate court previously has addressed the issue. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57–58, 69–70 (2007); *Marino v. Ocwen Loan Servicing LLC*, 978 F.3d 669, 673–74 (9th Cir. 2020). Here, no caselaw—let alone appellate authority—interpreted Daniel's Law or its interaction with the FCRA when LNRS implemented the security freezes. Nor was there appellate guidance on "direct request" or liability for wrongful freezes. LNRS reasonably understood Plaintiffs' Daniel's Law requests to include avoiding FCRA disclosures of home addresses and phone numbers, particularly because the statute lacks an FCRA carve-out.

In any event, regardless of whether statutory damages are available, Plaintiffs still need to establish that injury can be evaluated on a classwide basis. *See Huber*, 84 F.4th at 157. As Plaintiffs concede in their brief, "[t]he FCRA creates a private right of action allowing ***injured*** consumers to recover statutory, actual, and punitive damages." (Pls. Br. at 4 (emphasis added).) As explained above, because determinations of injury to class members requires individualized inquiry, Plaintiffs have not shown that injury can be assessed classwide. *See, e.g.*, *Stromberg*, 2024 U.S. Dist. LEXIS 70792, at *7.

### 2. The Class Is Not Ascertainable.

The proposed class is not ascertainable because there is no objective, administratively feasible way to determine class members. *See Carrera*, 727 F.3d at 307. As noted above, defining the class simply as covered persons who received security freezes from LNRS is improper because it sweeps in thousands of individuals who were not injured or who evidently wanted the freeze (as

[7] LNRS has not yet moved for summary judgment on this issue per the Court's Scheduling Order (Dkt. 109). LNRS is prepared to file a summary judgment motion if the Court wishes to consider this issue in further detail.

they never sought to lift it, or lifted it only temporarily to complete specific transactions, like Doe-4).

Determining whether any class members were injured and who they are is a multi-step process that requires making inquiries of many third parties, defeating ascertainability. Such inquiry starts with a review of LNRS records, to determine which class members were subject to an FCRA inquiry, and if LNRS declined to release information due to the freeze—requiring pulling myriad individual records for 17,000 persons. *See, e.g.*, *Bennett v. Quest Diagnostics, Inc.*, No. 17-1590, 2023 U.S. Dist. LEXIS 99792, at *38 (D.N.J. June 8, 2023) (finding ascertainability not met where plaintiffs did not outline straightforward "yes-or-no" review of existing records that would allow class to be ascertained).

Even that alone is not enough. Inquiry would have to be made to third parties to see if credit or insurance was in fact withheld, and to the consumer to see if there was an adverse impact. For example, the creditor/insurer may have obtained the information from a different CRA, as Synchrony Bank did by obtaining Doe-4's credit information from TransUnion, and as TD Bank did by obtaining Doe-1's credit information from Equifax. (Exs. W, M.) The consumer may have temporarily or permanently lifted the freeze to allow the transaction to proceed, as Doe-4 did on four separate occasions. (*See* Ex. N, Doe-4 Dep. Tr. 71:15–72:3, 91:20–92:1, 118:4–6, 119:13–120:21). Or the product at issue may have been sold by the time the consumer even sought to lift the freeze, as occurred with the vehicle Doe-4 sought to purchase. (Ex. N, Doe-4 Dep. Tr. 91:20–92:7, 147:9–13.) For the two named Plaintiffs alone, inquiry had to be made of twelve other companies to determine whether there was injury associated with any alleged transaction. (*See* Boxer Decl. ¶ 16.)

"[C]ourts have held that where nothing in company databases shows or could show whether individuals should be included in the proposed class, the class definition fails." *Marcus*, 687 F.3d at 593 (citing cases). For example, in *Marcus*, the plaintiff sought to certify a class of individuals who purchased BMW vehicles with a particular brand of allegedly defective tires that went flat and needed to be replaced. *Id*. at 592. The Third Circuit found that "[t]he proposed class raises serious ascertainability issues" because it was unclear whether BMW could identify owners of the vehicles with the relevant tires (which were manufactured by a different company) and it was possible the tires were changed at the dealership before the vehicle was sold. *Id*. at 593–94. Furthermore, the plaintiffs lacked a methodology for identifying the owners whose tires needed replacement, as class members could have used a repair shop rather than a BMW dealership. *Id*. at 594.

Similarly, in *Carrera*, the Third Circuit vacated certification of a class of purchasers of a dietary supplement, holding that the plaintiff's proposed reliance on third-party retailer records was insufficient because there was no evidence that purchasers could be identified using those records, and no evidence that retailers even maintained records for the relevant period. 727 F.3d at 308–09; *see also In re Niaspan Antitrust Litig.*, 67 F.4th 118, 137 (3d Cir. 2023) (affirming denial of class certification for end-payor plaintiffs in pharmaceutical antitrust case, holding that third-party data was insufficient to determine class members).

Further, the class is not ascertainable because the class definition is too broad and ambiguous. *See Byrd v. Aaron's Inc.*, 784 F.3d 154, 164–65 (3d Cir. 2015). Plaintiffs themselves are apparently unable to identify class members. They incorrectly state there are approximately 18,607 class members, but LNRS provided Plaintiffs with the list of individuals who submitted Daniel's Law nondisclosure requests using AtlasMail email addresses in December 2023 and

January 2024 and for whom a security freeze was placed—there are 17,351 individuals on that list. (Pls. Br. at 10; Boxer Decl. ¶ 28; Gardner Decl. ¶ 23.) Further, individuals whose freezes were promptly lifted should be removed from the count. (Gardner Decl. ¶ 36.)

Also, Plaintiffs' class definition is not limited to covered persons who made Daniel's Law requests through AtlasMail. (*See* Decl. of Rajiv D. Parikh ¶ 4.) Requests could be made by phone, online portal, by mail, or other email addresses, making it impossible to identify every requester across all channels. For example, isolating phone calls where a New Jersey Daniel's Law request was made would require reviewing thousands of monthly call recordings. And unlike the more standardized AtlasMail requests, other Daniel's Law requests may use different wording, raising additional questions of intent. (*See* Gardner Decl. ¶ 30.) For example, there may be individuals who more explicitly requested a security freeze.

Second, Plaintiffs' class definition contains no time limitation, rendering the class unascertainable. *See Guidry v. Wilmington Tr.*, 333 F.R.D. 324, 329 (D. Del. 2019) ("[A]n open-ended end-date is untenable." (citation omitted)). Nor does the class definition exclude individuals who quickly had their security freeze lifted, and therefore could not have been impacted by the freeze.

Finally, the class definition is improper because it references individuals who contacted SageStream, a separate legal entity that is not even a defendant here. "[T]he court has a 'responsibility to "protect absentees by blocking unwarranted or overbroad class definitions."'" *In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 514 (W.D. Pa. 2019) (quoting *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 291 (3d Cir. 2011); *see also Paper Sys. Inc. v. Mitsubishi Corp.*, 177 F.R.D. 435, 438 (E.D. Wis. 1997) (denying class certification because proposed class definition included potential class members who made purchases from entities that were not

defendants). Plaintiffs' class definition does not meet Third Circuit requirements and renders the class unascertainable.

**3. A Class Action Is Not a Superior Means of Adjudication.**

In addition, a class action is not superior to other available methods of adjudicating this controversy. Fed. R. Civ. P. 23(b)(3); *see Klotz v. Trans Union, LLC*, 246 F.R.D. 208, 217 (E.D. Pa. 2007). Here, far simpler and fairer alternatives exist.

First, lifting a security freeze is simple. (Kubes Decl. ¶ 54.) Any covered person who does not want the freeze can send an email, call the LNRS Consumer Center, or use LNRS's web portal, and the freeze will be lifted. (Gardner Decl. ¶¶ 31–32.) A phone call makes far more sense than class litigation, particularly when most would-be class members chose to keep the freeze in place. Indeed, when given the choice, 14,000 of the 17,000 Atlas emailers declined to lift the freeze, and others (including Doe-4) requested only temporary lifts and then had the freeze restored. (*See, e.g.*, Ex. Y at 5, Interrogatory Response No. 20; Ex. G.)

Second, Plaintiffs' claims can be, and are being, brought individually. In the concurrent litigation pending before this Court, nine individual plaintiffs who are members of this putative class (including Doe-3 and Doe-4) are asserting seemingly identical FCRA claims against LNRS for imposing/failing to lift security freezes. *See* Am. Compl. ¶¶ 194–207, *J.V. v. LexisNexis Risk Sols. Inc.*, No. 2:25-cv-18288 (D.N.J. Dec. 8, 2025), Dkt. 1-1; *accord Pendleton v. Trans Union Sys. Corp.*, 76 F.R.D. 192, 198 (E.D. Pa. 1977) (denying class certification where existence of several individual FCRA actions against same defendant "demonstrate[d] the interest of individual class members in bringing separate actions"). That concurrent litigation refutes Plaintiffs' contention that individual suits are not feasible. (*See* Pls. Br. at 23.) Their contention also overlooks FCRA's fee-shifting provision, which makes individual cases economically viable and

provides an independent incentive to pursue them. *See* 15 U.S.C. §§ 1681n(a)(3), 1681o(a)(2); *Harper*, 2006 U.S. Dist. LEXIS 91813, at *28.[8]

Third, the same individualized inquiries that defeat predominance also defeat superiority. Resolving each class member's claim would require case-by-case proof of whether the person wanted the freeze, whether any credit inquiry was made, and whether injury resulted—precisely the kind of mini-trials that render class treatment unwarranted. *See Dukich*, 343 F.R.D. at 309 (Bartle, J.) (denying certification because there were "simply too many uncommon issues to achieve the economies of time that class treatment is meant to provide" (citation modified)); *Lloyd*, 585 F. Supp. 3d at 660 (Bartle, J.) (denying certification because the "need for individual inquiries into causation and injury undercuts any benefit class treatment could provide"). The superiority requirement is not met, and certification should be denied.

**B. Certification of the Subclass Should Be Denied.**

"Under Fed. R. Civ. P. 23(c)(5), subclasses must separately satisfy the requirements of Rule 23 before they may be certified." *Agostino v. Quest Diagnostics Inc.*, 256 F.R.D. 437, 470 (D.N.J. 2009). Here, the insurance subclass cannot be certified for the same reasons as the primary class. In addition, the subclass lacks numerosity, and is not ascertainable for additional reasons.

**1. The Subclass Lacks Numerosity.**

The subclass does not meet Rule 23's requirement that a proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). A putative class of less than forty individuals (like the proposed subclass) faces a "particularly rigorous" inquiry into impracticability. *Allen v. Ollie's Bargain Outlet, Inc.*, 37 F.4th 890, 896 (3d Cir. 2022). Plaintiffs

---

[8] Perhaps recognizing the impact of the concurrent, overlapping individual claims on their class action application, shortly before this Motion response was due Plaintiffs' counsel filed a motion to amend the individual complaint to seek class action status in that case as well. Such last-minute procedural machinations do not change the points set forth above.

bear the burden of demonstrating numerosity. *See Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 484 (3d Cir. 2018) (citation omitted). "When plaintiffs cannot directly identify class members, they must show sufficient circumstantial evidence specific to the products, problems, parties, and geographic areas actually covered by the class definition to allow a district court to make a factual finding." *Allen*, 37 F.4th at 896 (internal quotation marks and citation omitted).

Here, Plaintiffs assert the proposed subclass consists of at least thirteen individuals, (Pls. Br. at 11), but do not identify them or explain their methodology in arriving at that number. In any event, thirteen class members is insufficient. *See In re Modafinil Antitrust Litig.*, 837 F.3d 238, 250 (3d Cir. 2016) ("[T]he Supreme Court has stated in *dicta* that a class of fifteen was 'too small to meet the numerosity requirement.'" (quoting *Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 331 (1980))).

Curiously, while Plaintiffs claim that Doe-3 and Doe-4 would be members of this subclass (Pls. Br. at 11), neither Doe-3 nor Doe-4 were denied insurance due to the security freeze. (Exs. T ¶ 5, V ¶ 5.) Plaintiffs then point to (1) an email in which a proposed class member stated an insurance underwriting department needs to access his file, and (2) a call log containing notes describing consumer calls with LNRS. (*See* Pls. Exs. 28 and 29.) Plaintiffs do not specify which of the over 300 call notes they are referencing, but in any event, these documents do not establish that a consumer report was sought for insurance underwriting and that LNRS did not furnish a consumer report as a result of the security freeze. (Pls. Ex. 28.) Further, some of the entries that reference insurance show that the consumer did not even have a security freeze, or that the consumer was able to lift the freeze to complete the transaction. (*E.g.*, *id.* at 5, 30, 32, 51, 114.)

Plaintiffs point to "sampling and other evidence," (Pls. Br. at 11–12), but provide no support showing how many members of the proposed class sought insurance—that too is

insufficient. *See, e.g., Marcus*, 687 F.3d at 597 (reversing numerosity finding based on speculation). Further, this case is unlike *In re Prudential Ins. Co. of Am. Sales Pracs. Litig.*, cited by Plaintiffs (Pls. Br. at 11), where the class totaled "in excess of eight million" class members. 962 F. Supp. 450, 510 (D.N.J. 1997). By contrast, Plaintiffs' assertion of a subclass "at least in the hundreds" has no basis. (Pls. Br. at 11.) Plaintiffs have not met their burden.

### 2. The Subclass Is Not Ascertainable.

Like the primary class, the subclass definition sweeps in individuals who were not injured and lack standing. Determining injury would require making inquiries of each insurer from which each class member sought insurance to find out whether the insurer denied insurance and why. For example, Doe-3 and Doe-4 were both able to obtain insurance despite their security freezes at LNRS. (Exs. T ¶ 5, V ¶ 5.) There are many reasons why an insurance policy may have been issued despite a freeze, or a consumer may have simply decided to use a different insurer (for example, if another insurer offered a lower premium). Because determining who is in the subclass will require individualized inquiries of third parties, the subclass is not ascertainable.

Further, the definition of the subclass is confusing and not "clear and precise." *Marcus*, 687 F.3d at 592. Plaintiffs' definition incomprehensibly includes all members of the primary class "who, while their security freezes were in place, directly or indirectly sought consumer reporting information for purposes related to insurance underwriting." (Decl. of Rajiv D. Parikh ¶ 5.) It is unclear what that means, and LNRS would not have data on consumer reporting information that was sought "indirectly" as opposed to directly from LNRS. The Court should deny certification of the subclass.

## V. CONCLUSION

Plaintiffs' motion for class certification should be denied.

Respectfully submitted,

**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
973.597.2500
*Attorneys for Defendant*
*LexisNexis Risk Solutions Inc.*

Dated: July 13, 2026

By: *_/s/ A. Matthew Boxer_*
A. Matthew Boxer