# EXHIBIT B

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
Civil Action No. 1:24-cv-04566

JANE DOE-2, JOHN DOE-3, and JOHN DOE-4, Individually and on behalf of all others similarly situated,
Plaintiffs,
-vs-
LEXISNEXIS RISK SOLUTIONS, INC., RICHARD ROES 1-10, fictitious names of unknown individuals and ABC COMPANIES 1-10, fictitious names of unknown entities,

Defendants.

VIDEO-RECORDED
DEPOSITION OF: JOHN DOE-3
CONFIDENTIAL

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by V. DARIO STANZIOLA, a Certified Court Reporter of the State of New Jersey, held at the law offices of PEM Law LLP, 1 Boland Drive, Suite 101, West Orange, New Jersey, on Friday, June 5, 2026, commencing at 9:09 a.m.

HUDSON COURT REPORTING & VIDEO (732) 906-2078

Page 2

A P P E A R A N C E S

Boies Schiller Flexner LLP
BY: Julia Bront, Esquire
44 Montgomery Street, 41st Floor
San Francisco, California 94104
(415) 293-6802
jbront@bsfllp.com
Attorneys for Plaintiffs
And
Boies Schiller Flexner LLP
BY: James Lee, Esquire
100 SE Second Street, Suite 2800
Miami, Florida 33131
(305) 357-8434
jlee@bsfllp.com
Attorneys for Plaintiffs

Lowenstein Sandler LLP
BY: Rasmeet K. Chahil, Esquire
Matthew Wester, Esquire
One Lowenstein Drive
Roseland, New Jersey 07068
(862) 926-2055
rchahil@lowenstein.com
mwester@lowenstein.com
Attorneys for Defendants

Also Present:
Vincent Falcetano, Legal Videographer

Page 3

I N D E X


| Witness: JOHN DOE-3 | PAGE |
|---|---|
| By Ms. Chahil | 6, 128 |
| By Ms. Bront | 119 |


I N D E X O F E X H I B I T S


| NUMBER | EXHIBIT | MARKED |
|---|---|---|
| Exhibit DM 1: | Plaintiffs' Third Amended Class Action Complaint | 19 |
| Exhibit DM 2: | E-mail string with the top from Julia Bront dated 4/2/2025 | 38 |
| Exhibit DM 3: | E-mail from [redacted] dated January 2, 2024, Bates JOHNDOE3- '0040 | 43 |
| Exhibit DM 4: | E-mail from [redacted] dated January 2, 2024, Bates JOHNDOE3- '0042 | 43 |
| Exhibit DM 5: | E-mail from [redacted] dated January 2, 2024, Bates JOHNDOE3- '0043 | 43 |
| Exhibit DM 6: | E-mail from [redacted] dated January 2, 2024, Bates JOHNDOE3- '0047 | 44 |
| Exhibit DM 7: | E-mail from [redacted] dated January 2, 2024, Bates JOHNDOE3- '0049 | 44 |
| Exhibit DM 8: | E-mail from [redacted] dated January 2, 2024, Bates JOHNDOE3- '0037 | 44 |
| Exhibit DM 9: | E-mail from [redacted] dated January 2, 2024, Bates JOHNDOE3- '0038 | 44 |
| Exhibit DM 10: | E-mail from [redacted] dated January 26, 2024, Bates JOHNDOE3- '0051 | 60 |
| Exhibit DM 11: | E-mail from [redacted] dated January 26, 2024, Bates JOHNDOE3- '0056 | 60 |
| Exhibit DM 12: | E-mail from Privacy Team dated 1/18/2024 | 63 |


Page 4


| | | |
|---|---|---|
| Exhibit DM 13: | LexisNexis letter dated February 5, 2024 to [redacted] | 64 |
| Exhibit DM 14A: | E-mail from Ryan T. Van Syckel dated 3/24/2025 | 70 |
| Exhibit DM 14B: | Acord Cancellation Request/Policy Release dated 3/24/2025 | 70 |
| Exhibit DM 15: | E-mail string with the top from Ryan T. Van Syckel dated 3/25/2025 | 72 |
| Exhibit DM 16: | E-mail string with the top from [redacted] dated 3/26/2025 | 76 |
| Exhibit DM 16B: | New Jersey Motor Vehicle Commission Explanation For Abstract Of Driver History | 76 |
| Exhibit DM 16C: | Non-certified Driver History Abstract Report for [redacted] as of March 26, 2025 | 76 |
| Exhibit DM 17: | Plaintiff John Doe-3's Responses To LexisNexis Risk Solutions's First Set Of Interrogatories | 79 |
| Exhibit DM 18: | E-mail from Matt Adkisson dated 2/17/2024 | 99 |

Page 49

that you had input?
A. I don't know if I knew that. I didn't really think about that.
Q. Did Atlas explain to you that it would be done this way with five separate e-mails?
A. I don't believe that was ever discussed specifically with Atlas.
Q. Okay. And then if you look at the last two exhibits that we handed you, DM 8 and DM 9, those each contain an address.
Do you see that?
A. I do.
Q. Okay. And why were there two separate e-mails sent each with an address?
A. Two separate e-mails being sent may have been simply my lack of knowledge on how to properly do this.
Are you asking why there's two different addresses?
Q. Are those both your addresses?
A. One is my current home address, and the old one, or the other one in Beach Haven, is -- I did reside there for a short period of time years ago.
So I wanted to -- I did everything in

Page 50

my power to try to be covered, and make sure my family was covered, we were all covered by Daniel's Law.
So I do remember putting that address in hoping it would help, because I sometimes still get mail from them at that address.
Q. Did you know that there would be two separate e-mails sent with the two different addresses?
MS. BRONT: Objection, asked and answered.
A. I did not know.
Q. Did you know that there would be seven separate e-mails sent out for you by Atlas?
MS. BRONT: Objection, asked and answered. And mischaracterizes testimony.
MR. LEE: Like five times.
A. Could you ask the question again, please.
Q. Yeah.
MS. CHAHIL: Can the court reporter read it back.
(THE QUESTION WAS READ BACK.)
MR. LEE: Same objection.
A. I didn't --

Page 51

MS. BRONT: Same objections.
A. I didn't know there would be numerous e-mails sent out by me.
Q. Okay. Did you know that your seven e-mails would be mixed in with 47,000 other e-mails?
MS. BRONT: Objection, argumentative, calls for speculation.
A. I would not know the number. I did not know the number.
Q. What did you understand these requests to be asking LexisNexis to do?
A. The same requests that went to everyone, not to lock my credit down. It was very simply to -- for my wife, me -- well, my wife, my three children and me to not have our address or phone number, to have it pulled off the internet for protection.
Q. Are you familiar with the Fair Credit Reporting Act?
A. I've heard of it.
Q. What's your understanding of it?
A. I don't really have a very good knowledge base on that.
Q. Did anyone at Atlas explain to you that

Page 52

because there's no Fair Credit Reporting Act exception under New Jersey Daniel's Law, that companies may respond to these requests by implementing a security freeze?
MS. BRONT: Objection, misleading the witness.
A. That was never discussed.
Q. And at the time these e-mails were sent out, did you have an understanding of what LexisNexis does?
A. So that's kind of a broad question. I have heard of LexisNexis. I don't know specifically what you're asking.
LexisNexis, to my knowledge, was a -- they sent out reports, data sharing.
Q. Do you know what a consumer reporting agency is?
A. I've heard of them.
Q. Were you aware that LexisNexis is a consumer reporting agency?
A. No.
Q. Were you aware that LexisNexis provides information governed by the Fair Credit Reporting Act?
A. I do not know the parameters

Page 53

surrounding LexisNexis.
Q. At the time that you sent these e-mail requests to LexisNexis, did you have any understanding of what products or services that LexisNexis provides?
A. I had heard of LexisNexis before. And my understanding was they send out -- it's an agency that forward reports, police reports to people that requested through LexisNexis. That's all I really was aware of with LexisNexis.
Q. Okay. And based on your understanding, did you know what the consequences of sending opt-out requests to LexisNexis would be?
MS. BRONT: Objection as to form. Vague as to opt out.
A. Can you repeat the question, please.
Q. Yeah.
MS. CHAHIL: Can the court reporter read it back.
(THE QUESTION WAS READ BACK.)
A. Consequences is an interesting word.
What I thought LexisNexis was going to do, like everyone else, was just keep my wife, me, and my three kids -- I've got to start putting me last -- and not -- and have our phone

Page 54

number and address removed from the internet. That's what I thought this was all about.
Q. When you say on the Internet, what do you mean by that?
A. Websites, businesses, whomever is -- disseminates information on the Internet.
Q. Do you know whether LexisNexis provides address and phone number information on websites?
MS. BRONT: Objection, calls for speculation.
A. I don't know.
Q. At the time that you sent out these e-mails, did you know what a security freeze is?
A. Yes.
Q. And what was your understanding of a security freeze?
A. So a security freeze, to me, is what my family currently has. And we requested a security freeze so there was no fraud or identity theft. We're trying to prevent that.
But we requested that through three different groups. And I can probably name two, and I'll draw a blank on the third name.
But we requested it, we use it. We've shut it down before where we've called -- if we

Page 55

needed a loan or we were doing something to get a credit card, we were able to do that. But that was stuff we requested.
I had no idea through Daniel's Law or LexisNexis that -- nor did we give permission for anybody to freeze the credit and then make it so that I couldn't get it unfrozen.
Q. Is that Equifax, Experian, and TransUnion?
A. TransUnion. Yes, ma'am.
Q. Okay. And your family currently has security freezes with those three credit bureaus?
A. Yes.
Q. And you've been able to temporarily lift them as needed?
A. Correct.
Q. Okay. And are you aware that LexisNexis has that same ability as well?
A. I'm going to have to say no, I'm not aware of that because it didn't work when I tried.
I'm still not convinced I'm lifted. I'm getting angry. I've got to stop.
Q. When you've communicated with these three bureaus, how have you gotten in touch with

Page 56

them?
A. My wife does it all the time. And I believe by phone and possibly by e-mail. I didn't pay a great deal of attention.
Q. Have you ever, yourself, been in contact with these three bureaus?
A. I don't believe I have ever contacted the three to get -- to lift the freeze.
Q. Have you ever contacted them to put on a security freeze?
A. No. She did -- I usually sit with her and give her moral support, because she's the boss. Sorry.
Q. That's a good attitude to have. I like that.
A. The truth is the truth.
Q. Okay. How long have -- has your family had security freezes with the three bureaus?
A. I don't recall when she applied or when we applied and started it. I just don't recall.
Q. Has it been over --
A. Several years.
Q. Okay. And why did you seek to have security freezes with those three?
A. For the very obvious reason of there's

so much identity theft and fraud that currently occurs, I'll just leave it within this country, that it was our goal simply -- strictly for the security freeze to protect us at our request.
Q. And you and your wife both have security freezes with the three bureaus?
A. Yes.
Q. And you have children; correct?
A. Correct.
Q. I believe you have three children; is that right?
A. Correct.
Q. Okay. And do all three of them also have security freezes with the three bureaus?
A. Yes.
Q. Going back to Atlas. When you signed up for Atlas' services, what information did you need to provide?
A. I don't recall exactly what I needed to provide to them to sign up for Daniel's Law.
Is that what you're asking, to sign up for Daniel's Law?
Q. To sign up on the Atlas website.
A. I don't recall exactly what I needed to fill out. I would -- okay. I don't recall.



Q. Okay. Do you recall having to provide information on Atlas' website when you signed up?
A. Well, a specific memory, I'd say no. But, I mean, they would need my name. They -- they have to start somewhere. They -- I have to identify myself in some fashion.
Q. Okay. When you provided your information on the Atlas website, do you remember what happened next?
A. I don't.
Q. Do you remember whether Atlas provided a list of data brokers to send non-disclosure requests to?
A. There were lists of many on -- on the site. There was many names.
Q. And do you remember whether there was an option to select all, to send e-mails to all of them?
A. I believe so. You -- you checked a box to attach all of them.
Q. And did you use that option?
A. I believe so, yes.
Q. Okay. And do you recall LexisNexis being within that select all option?
A. I don't recall seeing the name -- their



name.
Q. How many e-mails have you sent from your AtlasMail account?
A. I would think the only e-mails I sent were the e-mails -- these listed, and any e-mail to have family -- my family's information pulled off -- however many e-mails. I don't recall exactly how many.
Q. Is it your understanding that e-mails for your family members were sent from your Atlas account?
A. Yes.
Q. So like, for example, [redacted] didn't have her own Atlas account?
A. No.
Q. Okay. And do you have any copies of any service terms or other agreements regarding your Atlas account?
A. I don't have any documentation.
Q. I'm going to show you some more documents.
A. Clear it?
Q. Yeah, you can put those to the side.
A. I'll just put them in order.
MS. CHAHIL: For the record, handing



you DM 10 that is Bates stamped JOHN DOE-3 -51.
(Exhibit DM 10: E-mail from [redacted] dated January 26, 2024, Bates JOHNDOE3- '0051 marked for identification, as of this date.)
MS. CHAHIL: And I'll have one more document to hand you.
This will be marked DM 11. And it is JOHN DOE-3 -56.
(Exhibit DM 11: E-mail from [redacted] dated January 26, 2024, Bates JOHNDOE3- '0056 marked for identification, as of this date.)
Q. Okay. You should have DM 10 and 11 in front of you.
Do you recognize these two documents?
MS. BRONT: Take your time and review them.
A. I have to say yes, I do recognize them.
Q. Okay. And these are e-mails sent from your AtlasMail account?
A. Yes. I sent them, yes.
Q. And do you see that these are both addressed at the top of the e-mail to SageStream?

A. Yes.
Q. Do you know what SageStream is?
A. I do not.
Q. Are you aware that it is a consumer reporting agency?
A. I am not.
Q. Did anyone at Atlas explain to you what would happen when you sent a Daniel's Law request to a consumer reporting agency?
A. No.
Q. Are you familiar with what a consumer report is?
A. Basically.
Q. Okay. What's your basic understanding?
A. I would think that it gives information on the consumer, someone who's looking to buy something, and whether they're a good risk or not.
Q. And do you understand that LexisNexis consumer reports contained a consumer's address?
MS. BRONT: Objection, calls for speculation.
A. I do not.
Q. Okay. But in sending these requests, you wanted your address to no longer be



disclosed; right?
A. Yes.
Q. Okay. And so you wanted consumer reporting agencies, like LexisNexis, to stop releasing your consumer report because that would contain your address on it.
MS. BRONT: Objection, misleading.
A. One more time?
Q. Yeah.
MS. CHAHIL: Can the court reporter read that back.
(THE QUESTION WAS READ BACK.)
MS. BRONT: Objection, misleading.
A. Yes, I wanted my address taken off.
Q. Did Atlas ever explain to you that the security freeze would prevent the disclosure of your home address and phone number?
MS. BRONT: Objection, misleading.
A. We didn't have that conversation.
Q. And that's what you asked for in your Daniel's Law requests, right, for your home address and phone number to not be disclosed?
A. That's Daniel's Law. That's my understanding, yes.
Q. And in looking back at the two e-mails



that are in front of you, DM 10 and DM 11, did Atlas ever explain to you why it was sending a second set of requests to SageStream?
A. Did who -- who --
Q. Atlas.
MS. BRONT: Objection, mischaracterizes prior testimony.
A. I apologize. You're going to have to ask -- you're going to have to repeat the question.
Q. Sure.
Did Atlas ever explain to you why it was sending a second set of requests that are addressed to SageStream?
A. No.
Q. I'm going to show you another document.
MS. CHAHIL: This will be marked DM 12.
(Exhibit DM 12: E-mail from Privacy Team dated 1/18/2024 marked for identification, as of this date.)
Q. And this is an e-mail -- I'm not sure why the formatting is this way, but after it says, Dear Consumer, the e-mail continues on to the back of the page there.
MS. BRONT: Take your time and review



the document.
Q. Do you recognize this document?
A. Yes.
Q. Okay. Did you review this e-mail when it was sent to you?
A. I don't believe when it was sent to me, no.
Q. Okay. When did you review it?
A. During deposition prep.
Q. Before deposition prep, had you ever seen this e-mail?
A. I don't believe so.
Q. Were you monitoring your AtlasMail inbox for any responses to your Daniel's Law requests?
A. Monitoring for replies and responses, no.
Q. Okay. I'm going to show you another document.
MS. CHAHIL: This will be marked DM 13.
(Exhibit DM 13: LexisNexis letter dated February 5, 2024 to [redacted] marked for identification, as of this date.)
Q. Do you recognize this document?
A. No.

A. Yes.
Q. Okay. And in this e-mail, Kerry Carr says, first sentence there, We are unable to obtain the renewal MVRs for [redacted] and [redacted] due to the insured has a security freeze in place.
Do you see that?
A. Yes.
Q. Who's [redacted]?
A. One of my children.
Q. Okay. I want to look at the page before that, which ends in -13. I want to look at the -- if you look at the -- halfway down the page, there's an e-mail from Ryan Van Syckel, March 24th, 2025.
Do you see that?
A. Yes. Yes.
Q. Okay. At the bottom of the e-mail, Mr. Van Syckel said, He asked me if you knew how to unfreeze it.
Do you recall asking Mr. Van Syckel that?
A. Yes.
Q. Okay. And then looking at the page before that -- or the prior two pages. So we'll



start on page -11, and then we'll go on to page -12.
Page -11, just the first page in the e-mail chain, there's an e-mail from Kerry Carr, says, The insured can contact the below.
And then if you go on to page -12, there's a box there. It says, Good afternoon, the consumer will need to contact the LexisNexis consumer center. And there's some contact information there.
Do you see that?
A. Yes.
Q. Okay. There's an e-mail address provided there, consumer.documents@lexisnexis.com.
Do you see that?
A. Yes.
Q. Did you try e-mailing that e-mail address?
A. I don't believe so.
Q. Okay. Did you try calling the telephone number that's listed there, the 1(800) number?
A. I think that's one of the numbers I did try to call.



Q. And what was the outcome of that phone call?
A. The outcomes weren't good. I couldn't get through. I kept getting hung up on, and it was not good.
Q. If you go back to page -11, it says -- second sentence there in that e-mail from Kerry Carr says, Or if the insured can contact Motor Vehicle for copies of their abstract showing their driving records, we can accept that.
Do you see that?
A. Just which -- which page is that?
Q. Sorry, the very first page ending in -11. And I'm looking at the e-mail from Kerry Carr at the bottom there.
A. Yes.
Q. And looking at the second sentence, it says, Or if the insured can contact Motor Vehicle for copies of their abstract showing their driving records, we can accept that.
Do you see that?
A. Yes.
Q. I want to show you another document.
A. The last one was 15, I believe.
MS. CHAHIL: This will be marked DM 16.



(Exhibit DM 16: E-mail string with the top from [redacted] dated 3/26/2025 marked for identification, as of this date.)
MS. CHAHIL: This will be 16B and this will be 16C.
(Exhibit DM 16B: New Jersey Motor Vehicle Commission Explanation For Abstract Of Driver History marked for identification, as of this date.)
(Exhibit DM 16C: Non-certified Driver History Abstract Report for [redacted] as of March 26, 2025 marked for identification, as of this date.)
Q. So I'm showing you the cover e-mail, which is marked DM 16, that's JOHN DOE-3 -15.
And then we have the first attachment to that e-mail that is DM 16B, that is Bates-stamped JOHN DOE-3 -16.
And then there is another attachment to the e-mail, which we marked DM 16C, and that is Bates-stamped JOHN DOE-3 -18.
MS. BRONT: Sorry. Was 16B JOHN DOE -3 -15.
MS. CHAHIL: B is -16.

MS. BRONT: Am I missing a document?
Thank you.
Okay.
I'm so sorry. Can you do the numbers one more time?
MS. CHAHIL: Yeah. So cover e-mail is 16. That is JOHN DOE-3 -15. And then JOHN DOE-3 -16 is DM 16B. And then JOHN DOE-3 -18 is DM C.
MS. BRONT: Understood. Thank you.
MS. CHAHIL: Yep. No problem.
BY MS. CHAHIL:
Q. Okay. So, [redacted] based on this e-mail, you obtained a driver's abstract from the Department of Motor Vehicles; correct?
A. Yes.
Q. And if you look at the date of the e-mail from the MVC, you obtained that on March 26th, 2025; correct?
A. Yes. That's what it looks like.
Q. And then on that same day, March 26, you provided the driver's abstract to Mr. Van Syckel?
A. I have to look at the -- do we -- do you have a copy of the e-mail where I provided it



to him?
Q. Yeah. So if you look at 16, DM 16.
A. Sixteen -- straight 16?
Q. Sixteen. Yep.
And if you look at the top e-mail, there, it's an e-mail from you to Mr. Van Syckel.
A. On 3/26.
Q. Yeah. So that was the date that you sent him the driver's abstract; correct?
A. Yes.
Q. Okay.
MS. BRONT: Take your time to review all the documents.
THE DEPONENT: Okay, okay.
Q. And then were you able to move the GMC Sierra from the business auto insurance policy to your family's personal auto policy?
A. Yes, after that.
I don't see an e-mail indicating -- do we have an e-mail indicating that, that coverage was given?
Q. Well, I'm asking you. Did you --
A. Well, it was able to happen, yes. I don't remember exactly when.
Q. And that was going to be my next



question is if you remembered one.
I'm going to show you another document.
MS. BRONT: I was going to say, it's been about an hour or so, whenever you're ready --
MS. CHAHIL: Yeah. I think --
MR. LEE: -- to take a break.
MS. CHAHIL: -- I'm just going to have one question on this, and then we can take a break.
MS. BRONT: Sounds good.
MS. CHAHIL: This will be marked DM 17.
(Exhibit DM 17: Plaintiff John Doe-3's Responses To LexisNexis Risk Solutions's First Set Of Interrogatories marked for identification, as of this date.)
Q. And do you recognize this document?
A. Yes.
Q. And these are your responses and objections to LexisNexis' first set of interrogatories; correct?
A. Yes.
Q. And can you turn to the last page of this document, page -18?
A. Um-hum.



Q. It's titled, Verification.
Is that your signature there?
A. Yes.
Q. Okay. And you verified that your responses in this document were true and correct; right?
A. To the best of my ability, yes.
Q. Okay.
MR. LEE: I thought we were taking a break.
MS. CHAHIL: Just literally one question.
MR. LEE: It's been five so far.
MS. CHAHIL: I have to lay the foundation.
Q. I want to look at your response to Interrogatory Number 6. So the interrogatory starts on page 8, and then your response is on page 9.
Give you a second to look at that.
A. Okay.
Q. Okay. And after the objections here, it says, John Doe-3 has since been able to obtain the insurance from Selective on or around March 28th of 2025.

Is that accurate?
A. Where is that again now?
Q. It is the very last sentence of your response to Interrogatory Number 6, which is on page 9.
A. Okay.
MS. BRONT: If it helps your recollection, this one refers to Interrogatory 5, so you can go back and read that one.
A. Okay. What's the question again?
Q. Yeah. You wrote here that you were able to obtain the insurance from Selective on or around March 28th, 2025.
Is that accurate?
A. That's what it says, yes.
Q. So it's accurate?
A. Yes.
Q. Okay.
MS. CHAHIL: We can go on break now.
THE VIDEOGRAPHER: Going off the record, 11:04 a.m.
(A BRIEF RECESS WAS TAKEN.)
THE VIDEOGRAPHER: We are back on the record, 11:21 a.m.



BY MS. CHAHIL:
Q. Did you discuss your deposition with your attorneys over the break?
A. No.
Q. Going back to the GMC Sierra that we were discussing, were there any days in which that vehicle was not insured?
A. I'd have to look at the dates to give you an accurate answer on that. It -- it was a very short period of time from when I requested the abstract to when I got it. I just don't remember the dates.
Q. Are you alleging that you suffered any financial damage relating to moving your vehicle from the business insurance policy to your personal policy?
A. Yes.
Q. And what is that damage?
A. Monetarily, specifically, the cost of the abstracts.
Q. How much did the abstracts cost?
A. I don't remember the exact cost. Between 10 and $15 per contract.
Q. Per abstract, you mean?
A. I -- I think I said abstract.



Q. Oh, I'm sorry. I heard contract for some reason. Okay.
A. I'm sorry.
Q. How many abstracts did you obtain?
A. Two.
Q. Other than the cost of the abstracts, any other monetary damages relating to the insurance for the GMC Sierra?
A. No.
Q. Did Selective ever tell you that they were going to stop insuring your vehicle?
A. Well, it didn't get to that point because they couldn't insure it. They didn't tell me, Once we gave you insurance, we're going to not insure it.
Q. So you did get the vehicle insured --
A. I did.
Q. -- from Selective?
A. Yes.
Q. I want to look back at DM 15. Should be in your stack there.
Okay. And I want to look at the page JOHN DOE-3 -13.
Looking down about halfway on the page, there's an e-mail from Ryan Van Syckel.



Do you see that?
A. Yes.
Q. Okay. In the e-mail, Mr. Van Syckel is saying, I spoke to the insured, who also happens to be a friend of mine.
He's referring to you there?
A. Yes.
Q. And then he says, Did you ever hear of John's Law? He is very high up in law enforcement, and their PBA union delegate made them do this.
Do you see that?
A. Yes.
Q. Did you say that to Mr. Van Syckel?
A. No.
Q. Okay. And who's your PBA delegate again?
A. Vittorio Spadea.
Q. And did you speak to Mr. Spadea about making requests under New Jersey Daniel's Law using Atlas?
A. I spoke to Spadea numerous times about Daniel's Law.
Q. Okay. And what did the two of you speak about in that regard?

A. Julia, yes.
Q. Okay. More than ten times?
A. I -- I don't know. I really don't know. More than ten times, I don't know.
Q. Okay. Are you aware of the current status of this case?
MS. BRONT: Objection, vague.
A. The only status I know is we're giving depositions right now. Other than that, I don't know any other status.
Q. Have you read any of the documents that have been filed with the court in this case?
A. Can you tell me which documents you're talking about specifically? Like the --
Q. Like any document that's been filed with the court.
So, for example, we had just looked at -- right, you have the amended complaint and you have your interrogatory responses.
Have you reviewed any other documents that have been filed with the court in this case?
A. Any other documents? I don't believe so.
Q. Okay. Do you have any financial arrangement with Atlas regarding this litigation?



A. No.
MS. CHAHIL: Okay. I don't think I have a lot more, but maybe we take a break now because I know we have lunch on the way and I can take a look at my notes and see if I have anything else.
MR. LEE: Okay.
MS. BRONT: Sure.
THE VIDEOGRAPHER: Going off the record, 12:24 p.m.
(A BRIEF RECESS WAS TAKEN.)
THE VIDEOGRAPHER: We are back on the record, 12:36 p.m.
MS. CHAHIL: I don't have any further questions at this time. Thank you for your time today, [redacted].
THE DEPONENT: Thank you.
MS. CHAHIL: Do you want to go into redirect or do you want to do it after lunch.
MR. LEE: I think we should do it after.
MS. CHAHIL: I think we should do it after lunch as well.
MS. BRONT: Sounds good.



Back off the record.
THE VIDEOGRAPHER: Going off the record, 12:36 p.m.
(A LUNCH RECESS WAS TAKEN.)
THE VIDEOGRAPHER: We are back on the record, 1:24 p.m.
EXAMINATION
BY MS. BRONT:
Q. All right. [redacted], I'm going to ask you some questions now, if that's all right.
A. Yes.
Q. You mentioned you and your wife requested security freezes from the three credit bureaus; right?
A. Yes.
Q. Did you ever make a request to LexisNexis for a security freeze?
A. I did not.
Q. Did you have any trouble getting LexisNexis to lift your security freeze?
A. Why I'd say it's trouble, I was unable to get it lifted and I -- I couldn't do it. And that's when the angst started.
Q. Why couldn't you do it?
A. Because every time I called, I either



didn't get an answer or someone answered, said, Hello, and the phone line died. Or I sat on hold for entirely too long after saying what my problem was and then the phone line died again.
Q. Were you harmed by LexisNexis putting a security freeze on your credit file when you did not request --
A. Yes.
MS. CHAHIL: Objection to form.
Q. You can answer.
A. Yes.
Q. Do you think a company like LexisNexis should put security freezes on police officers who are trying to protect themselves and their families under Daniel's Law?
MS. CHAHIL: Objection to form.
A. It's -- the question was -- just repeat the question, please.
Q. Do you think a company like LexisNexis should put security freezes on police officers who are trying to protect themselves and their families under Daniel's law?
A. No.
Q. Does asking LexisNexis not to disclose your phone number or address mean that you want a

security freeze?
A. No.
MS. CHAHIL: Objection to form.
THE DEPONENT: I'm sorry.
Q. Should you be able to get credit reports and be protected under Daniel's Law at the same time?
MS. CHAHIL: Objection to form.
A. Yes.
Q. Prior to 2025, did you know you had a security freeze placed on your file by LexisNexis?
A. No.
Q. Earlier today, you were shown documents from 2024 that you said that you hadn't reviewed.
Was that because you didn't know you had a security freeze at the time?
A. I did not know I had a security freeze at that time.
Q. So were you reviewing documents about security freezes when you didn't even know you had one?
A. No.
MS. CHAHIL: Objection to form.
Q. I'm going to hand -- I'd like to ask



you to take a look at what's been marked as DM 12.
Starting on the front page, this is an e-mail that you received in your AtlasMail on January 18th, 2024; right?
A. Yes.
Q. Let's turn it over.
The first sentence reads, Thank you for contacting LexisNexis Risk Solutions and submitting your recent request under New Jersey Law P.L. 2023, c.113, P.L. 2021, c.371, and Section 3 of New Jersey P.L. 2015, c.226.
I'm going to represent to you that that statute there is Daniel's Law.
Now, my question for you, is this letter LexisNexis admitting that you made a Daniel's Law request?
MS. CHAHIL: Objection to form.
A. Yes.
Q. Does LexisNexis say here that you requested a security freeze?
MS. CHAHIL: Objection to form.
A. No.
Q. Okay. Now, I'd like you to turn to what's been marked as DM 13.



On page 1 of DM 13, is the date of this letter February 5th, 2024?
A. Yes.
Q. Okay. So this one's a little different.
The first sentence says, Thank you for your request to place a security freeze on your file with LexisNexis Risk Solutions as provided by law in your state of residence.
Is this sentence true?
MS. CHAHIL: Objection to form.
A. No.
Q. Why not?
A. Because I never asked for a security freeze from LexisNexis.
Q. Okay. Thank you. You can put that away.
So when LexisNexis placed a security freeze on your file without your consent, did you have any emotional distress because of that?
A. Once I found out about it, yes.
Q. Describe how you felt.
A. Once I found out that there was a freeze on there, I was -- you know, as I was pretty clear before, I believe, I was distressed.



It was confusing. It did make me a little angry -- it made me angry.
But I didn't know what to do. I don't want to say I felt I was being used. But, I mean, it was -- it was a situation where like, How could someone do this to you and you can't control it or stop it, without your consent?
So it -- it was distressing for me. It really was.
Q. Were you distressed because you made a request to protect yourself and your family, and instead you received a security freeze?
MS. CHAHIL: Objection to form.
A. Yes. Being distressed was not having Daniel's Law. It was a security freeze that I didn't request.
Q. Was anything else about the experience you had with the security freeze distressing?
A. Well, I mean, the fact that you spend a lot of time -- you did spend money. The emotional aspect of not knowing how I'm going to get it back, waiting on the phone for -- seemed like forever for me.
And I actually feel like I was being stubborn by staying on hold so long because I --